We welcome you here today. We are prepared for your arguments by having read the briefs and the record excerpts. We have not necessarily gotten into the records, so we'll appreciate your giving us citations when appropriate. We also have a traffic light system, and a yellow light comes on, you have two minutes left in your argument. When the red light comes on, we ask you to please conclude unless you are answering a question from the court. We'll call the first case of the morning, Trois v. Greenberg-Traurig, No. 17-11464. It's our second Stanford case on the docket this week. And we'll hear from Mr. Young. May it please the court. Fifteen months ago, in the Kelly v. Nitchimoff decision, this court said that the Texas law of attorney immunity was somewhat in flux. But the catty-hanger decision from the Supreme Court had not resolved the question of whether attorney immunity applies outside of litigation or a litigation-like setting. And that no post-catty-hanger case law provided a satisfactory answer to that question. Today, nothing has changed. Some additional Texas cases have been decided, but none of them addresses the litigation exception, and all are in a litigation or litigation-like setting. Now, the Kelly court was able to affirm on alternative grounds. This court has no such luxury. The viability of the litigation limitation was squarely raised in the motion to dismiss, in the response, and in the district court's ruling. The pleadings allege copious non-litigation conduct by Carlos Lumiere and other Greenberg lawyers, and Greenberg did not contend otherwise in the court below. We believe, in this case, the most satisfactory resolution of the uncertainty identified in Kelly would be by certifying this case to the Supreme Court of Texas. The other immunity issues in the case, the existence of a crime exception and the applicability of immunity under the Texas Securities Act, would likewise benefit from certification. But against the merits, and let me address first the litigation limitation. In Kelly-hanger, four justices of the Supreme Court of Texas expressly opined that attorney immunity is limited to litigation. Justice Green's opinion for these four justices persuasively analyzed and reconciled the two issues. One was precisely referred to as litigation immunity, and arising historically in a litigation context, and the other involving the absolute privilege for communications made in judicial and quasi-judicial proceedings. And it compared and contrasted the Supreme Court case's applying immunity with the pool case in which the Supreme Court held that an attorney was liable for participating with his client in the commission of a fraud outside the litigation context. The opinion also analyzed the purposes of attorney immunity, the need to protect zealous advocacy, and reasoned that those purposes were outweighed in the non-litigation conduct by the need to refrain from immunizing attorneys' participation in their clients' fraudulent business schemes. It also noted that the procedural safeguards present in the litigation context are diminished outside of those contexts, making civil liability more of a necessary deterrent in the case of non-litigation conduct. Now dissents are not the law, but neither are majority opinions when they expressly decline to decide the issue. The majority in Kelly-hanger went out of its way to not only state that it need not consider the question, but it criticized the dissent, said that the dissent mischaracterized the majority opinion as even suggesting that immunity is not limited to the litigation context. So in short, Kenny-hanger provides no answer to the question pending before the court today. Kenny-hanger focused on whether the attorney's conduct was within the scope of the legal representation of the client. That is a fairly easy question to answer in the litigation context. But outside of litigation, attorneys can do and often do some things that only attorneys can do, but many things that can be done and often are done by non-attorneys. Without the litigation limitation, the courts either create a special privilege for lawyers when they do things and not when other professionals do those same things. Or it must engage in endless line drawing between things that are central to the attorney's role as representative of his client and things that are not. Finally, the limitation of attorney immunity to the litigation context does not leave non-attorneys without remedy. In many cases, they will lack a duty to the plaintiff. In many cases, they will lack privity with the plaintiff. And in many fraud cases, there will be no justifiable reliance. But in those cases where there is a duty and is a violation, the attorney's responsibility, attorney immunity, if applied outside the litigation context, would immunize a great many forms of misconduct. So to summarize on this point, the history of attorney immunity in Texas, the balancing of policy interests, and the administrability of the immunity doctrine all argue in favor of limiting attorney immunity to conduct in and around litigation, not necessarily from the filing of the complaint to the judgment, but associated with litigation and other adversarial quasi-judicial issues. Well, we can't issue a ruling apart from the facts that are alleged here. And so how do your facts apply to the rule that you want us to state, assuming we don't certify? This is a 12C ruling, so the court has to take the pleadings as true. The pleadings allege some activity by Mr. Lumiere and others that is, frankly, in a litigation context. But they allege the majority of the conduct that's alleged is not in a litigation context in any way, shape, or form. It's advice, it is lobbying of the government of Antigua, other proceedings that cannot possibly be characterized as litigation. If the court sustains the limitation to litigation and sends the case back, Judge Godbee will have to, as the case progresses, identify which alleged misconduct is connected to litigation and which is not, and presumably, if that's the only basis for the court's ruling, will exclude those forms that are not part of litigation. Let me turn, if I may, to the Texas Securities Act. Attorneys rarely issue securities themselves, but they often aid and abet those who do. The TSA creates a broad, consumer-oriented remedial scheme, and that remedial scheme, unlike federal law, broadly imposes aider and abetter liability on anyone who materially aids a seller or offeror with either the intent to deceive or defraud or with reckless disregard of the facts or the law. And it creates its own internal set of affirmative defenses. One, if the buyer already knew of the untruth or omission, and two, if the seller or offeror did not know of the untruth or omission and could not have known through the exercise of reasonable care. Several courts have held that traditional common law defenses are not available under the TSA, at least to the extent that they undercut the statute's remedial scheme. It makes no sense to say, and is not consistent with the statutory scheme to say, that an attorney may aid and abet securities fraud with scienter merely because he does so in the course of representing a client. The TSA says that it is to be construed in harmony with federal law. Let me ask you, I mean, just off-the-wall question here, but Enron failed, leaving thousands and thousands of investors in the lurch. How come there's no litigation springing out of Enron of this sort? Well, Enron had, as you know, very prominent, numerous prominent law firms, and I think a couple of them settled with Enron or with its receiver. Well, it may be that it was all a result of, I don't know is the answer to your question. It may be as a result of settlements. It may be that there were an awful lot of attorneys who could have been sued. Well, I think limitations is run for their benefit. It's instructive to look at federal securities law as it existed prior to the Supreme Court Central Bank decision when aiding and abetting liability still existed in private civil actions. And in that era, federal courts held attorneys liable on the same basis as everybody else for aiding and abetting federal securities violations. There are textual indications in the TSA that the same result applies here. We've cited in our Rule 28J letter Section 33N of the Securities Act. That section creates the concept of a small business issuance of securities, and it establishes a limitation of liability for a person who has been engaged to provide services relating to a small business issuance, and it expressly includes attorneys and law firms. Now the provision by its very existence implies that those attorneys who are hired to provide services by an issuer have potential liability under Section 33 of the TSA for violations committed in the course of providing those services. If that were not so, there would be no reason to limit that liability. That potential liability is at odds with attorney immunity for acts committed in the course of providing those services. Now my colleague says that attorney liability under the TSA is limited to cases of direct misrepresentation to non-clients with the intent that they rely on those representations. Respectfully, that confuses the issue of duty with the issue of immunity. Under the Supreme Court's McCamish decision, there is a duty by an attorney to a non-client in those circumstances. For negligent misrepresentation and by extension for fraud, if I write an opinion letter knowing that it's going to be relied upon by a non-client. But that's the measure of the attorney's duty, not an immunity concept. Under the TSA, the attorney has the same duty that everybody else has, not to aid and abet in a securities violation. That does not require privity. That does not, in the case of the TSA, require reliance. And instead, the attorney's liability is measured by Section 33. Did he know or was he in reckless disregard of the truth or the law? The Supreme Court of Texas has said that the TSA is to be given the widest possible scope. As the courts have recognized, that means allowing defenses only when they're consistent with the remedial scheme. And affording immunity in that situation would undercut that scheme. So let me end where I began. Attorney immunity is a subject fraught with the balancing of competing policy considerations. When should the law favor attorney freedom of action and independence? And when should it favor constraints on that freedom and independence in pursuit of a higher policy objective? This court decides state law public policy questions every day, no question about it. But it rarely decides such questions in the face of this much state law uncertainty. And so let me reiterate our belief that this case is appropriate for certification. If the court, however, does not incline to certify the question, we respectfully submit that the judgment should be reversed and the cause should be remanded. I'd be happy to answer any questions. I guess not at the moment. You will have an opportunity for rebuttal. Mr. Singer. Thank you, Your Honor, and may it please the Court, Stuart Singer, on behalf of Greenberg Traurig. In this case, the plaintiffs alleged that the lawyer, central lawyer who was working for Greenberg Traurig, Mr. Lumiere, was acting within the course and scope of his respective employment with Greenberg Traurig and in furtherance of said law firm's respective business when he engaged in the wrongful conduct described therein. That's paragraph 459 of the complaint. There is no issue here that any of the conduct by Mr. Lumiere or Greenberg was outside the role of a lawyer, was, in the words of Cantyhanger and Poole before it, foreign to the duties of a lawyer. It was the work that transactional lawyers and others do every day, corporate work, banking work, regulatory work, securities work, and some litigation work. There were no allegations or remuneration that was other than legal fees, no hidden equity interests, none of the fact patterns in cases like Poole where a lawyer committed conduct that was outside the role of being a lawyer. So as I think the appellants recognize when they say on page 2 of their brief, what they're seeking is an exception to an immunity that clearly would apply to the Greenberg Traurig firm and its lawyers for the work that was done in this case. Now we submit that the rationale of attorney immunity applies whether the lawyer is drafting a corporate transaction, negotiating a deal, working with the SEC, or appearing here in court. For lobbying the government of Antigua? That is what lawyers do, and it's subject to regulations. Just like lobbying effort would be in the United States, just like actions with respect to going before the SEC, going before banking commissioners, and asking for- I can see regulation as lobbying is lobbying. Well, when we say lobbying, the work that was done in Antigua, Greenberg was retained by the government of Antigua to provide assistance in connection with drafting enhanced banking laws for Antigua. And- So it was really advising the government. Yes. And I think that that is the type of work, you know, in a big country like the United States, they have the capacity to have a large group of lawyers working for the government to do that. And this was done by having outside lawyers provide such advice in the case of Antigua. Is the Texas liability scheme broader than- I mean, is the immunity, the way you would argue it, broader than that of other states? I think this is a- it's certainly broader than certain other states, but it's not broader, I believe, with respect to securities matters than where Federal securities law provides protection for attorneys and other professionals. And in answering this, I think I can answer or try to answer Your Honor's question about Enron, which is where you had an exchange-traded stock. And because it was an exchange-traded stock, any litigation on those issues had to be in Federal court under the 34 Act. And in Central Bank of Denver, as the Court is aware, the Supreme Court said there is no aiding and abetting cause of action, and that's why you don't have actions like this involving Enron and most securities transactions, which would be governed by Federal law. So Texas has, in a way here, reached a similar conclusion by broadly immunizing attorneys. And the rationale for doing so was very well stated by this Court in the Troy's decision. The Court said the doctrine stems from the broad declaration that attorneys are authorized to practice their profession, to advise their clients, and interpose any defense without making themselves liable for damages, that attorney immunity is necessary to avoid the inevitable conflict that would arise if an attorney were forced constantly to balance his own potential exposure against his client's best interest. And the Court went on to say the purpose for attorney immunity is thus quite similar to the purposes animating other immunities that Texas has recognized as providing true immunities, such as judicial immunity and prosecutorial immunity. You know, and I'm not making a comment on the status of the law, but of the law applicable to this case, but in general, no one denies that law has become at least as much a business, a pure business, as a profession. And that being the case, lawyers are for hire, lawyers are hired guns, and there's a, you know, there may at some point need to be a reassessment of the total immunity that lawyers would have on the theory that they disinterestedly represent their client only until their client crosses the line. Well, Your Honor, I wouldn't disagree. I would say, though, that is something for the Texas Bar, the Texas Supreme Court, the Texas legislature. Do you think Federal courts can't step in and handle this? Well, I think Federal courts can resolve this issue. I disagree with my colleague in — on the issue of whether or not a certification is needed here. And I disagree because whatever uncertainty may exist in a cantyhanger decision — and he recognizes four justices there do not make a majority, that's a minority — consistently you have lower court decisions in Texas which have rejected this litigation exception which the appellants argue should be adopted. If you look at their reply brief, they tried to distinguish something like 14 different cases, both before and after cantyhanger, that all either expressly rejected a litigation exception or applied the attorney immunity without even discussing that issue. Six of those were in nonjudicial foreclosures. Well, that is a foreclosure, they say, but it's still not litigation in Texas. It's nonjudicial. They say three of the cases were dictum because it was litigation-related activities. That will certainly be a clear standard for courts to apply. Several of those cases, like Santiago, expressly rejected the idea that it was a litigation exception. The case of Rogers, for example, in the lower Texas court, was one where an attorney allegedly took trade-secreted information and used it outside of that to threaten a party with disclosure. And yet because that was still within the context of attorney duties, the Court said that that was not something that was outside of the duties of a lawyer. A couple of the cases they say should be distinguished because they relied on this Court's statement in Iqbal before cantyhanger that there was no litigation exception under Texas law. I respectfully don't think that that distinguishes the lower court in Texas from reaching that conclusion. And then three cases, they say, applied the immunity without discussion. So on the terms of your own reply brief, you have about more than a dozen cases, plus a couple more we added with supplemental filings, such as Bethel, that were decided in 2018. And the remarkable thing about those cases is that they all come out the same way. They all apply immunity. And there are no cases going the other way post-cantyhanger. And — You said lower court cases, but aren't they appellate court cases, Texas courts of appeals? They are, Your Honor. These are all intermediate appellate court texts from different divisions, the Dallas, the Beaumont. So you have a number of different courts represented in a wide range of cases. And this is exactly what has been said before should be relied upon by this Court and by the Federal courts in making the so-called eerie prediction as to what the Texas court would do if there is not a clear resolution of the issue by the Texas Supreme Court. And here you have a wealth of authority from those intermediate courts, all pointing in the same direction. Now, in addition to that, which suggests that the rationale for the immunity applies to non-litigation work, and this distinction that — well, my colleague used the term that he thought the immunity should apply in and around litigation. What kind of standard would that be to apply in and around litigation? Look at Cantyhanger itself. There you had the immunity applied to the transfer of a deed, allegedly to avoid a tax that would be imposed. That was more than 12 months after the divorce decree finished, and yet that was held to be within litigation. It is, I would submit, at least as easy and easier to look at what is looked at every day by bar associations. Is this work that requires a law license? If it is, if it's part of the duties of a lawyer, and all those which are alleged in this case fall within that, then the immunity applies. Now, you still have, if you get into a situation where a lawyer — for instance, there was a lawyer in Florida who ran a Ponzi scheme from his law office, of course that person is subject to that. Just like in the Poole case, a lawyer was subject to liability. Well, there's something that's been noted in the press in Texas recently in which a fairly prominent criminal defense lawyer was named an unindicted co-conspirator because he was representing a very well-known criminal group. I won't go farther than that, but if that were the case, would that person be able to give them legal advice? That money laundering might run afoul of the law. No, Your Honor, I don't believe he would. I mean, first of all, because that would be an indictment and therefore a criminal action, and we're dealing here, I think, with an immunity that would be limited to civil action, which means that in addition to all the other regulatory restraints on transactional lawyers, the SEC, banking authorities, the bar associations, if someone acts in a criminal fashion, you have the criminal law that sounds like that case relates to. Well, it could have civil ramifications. That sort of connection could have civil ramifications from somebody whose money had been extorted or a bank that had been liable for money laundering because funds were going through it, and you're saying if the lawyer was rendering legal advice, albeit in a, you know, whatever that advice was, that he would unequivocally have immunity. Well, if the actions was that of a lawyer, if it was rendering legal advice and it's just being alleged that, well, he must have known that there was a money laundering scheme going on, then that, I think, is what the Texas Supreme Court in Cantyhanger was getting at when they said, we want you to look at the type of conduct rather than issues of intent because anyone can allege bad intent by the lawyer. The lawyer should have known. Greenberg-Trarick should have known that something was going on here. It's a very easy allegation to make, and here we are six years later after the lawsuit's been filed still defending that when the issue is the type of conduct. Now, if there was allegations here that the type of conduct was that that a lawyer doesn't engage in, secret profits, issues of remuneration beyond that which a lawyer typically receives, someone who goes into business with his or her client and commits a fraud, those are the things that are outside the duty of lawyering, and that is where the civil liability still remains. And I would note that this — with respect to that liability, I don't think opposing counsel said anything about the second argument that they briefed, which was the crime exception, because — and I think it follows from cantyhanger that if there's no fraud exception, there is no exception merely because the complaint would throw in a word saying that this is criminal intent. Again, that is not talking about the type of conduct. It is talking about the intent of the lawyer and a label that the plaintiff puts on that. And, in fact, that same label could have been put on the conduct in cantyhanger. The allegations and contentions in cantyhanger were fraud, aiding and abetting fraud, and conspiracy. And those are three of the four counts that are brought here against Greenberg-Trorik. In cantyhanger, you could make the same argument that if the attorney was engaged in aiding and abetting fraud, that was criminal conduct. Anytime mails or wires would be used, you would have a violation of mail or wire fraud statute. So it would essentially turn cantyhanger on its head and make it a dead letter if all that plaintiff's had to do was to add in an extra word saying that this conduct is criminal as well as fraudulent. And, again, there's no lower court which has suggested that there is this type of crime exception or criminal intent exception. And we cited the Bethel case and the Highland case, which are intermediate courts of appeal, which have rejected that type of argument after cantyhanger. Counsel, I'm sure you're getting to it. You have a little bit of time left. It seems to me you have a stronger argument on the law being settled at the lower court level, intermediate court level, both on litigation exception and on the crime exception. But how about the Texas Securities Act, which seems to have a purpose inconsistent with attorney immunity? So the argument goes. Well, Your Honor, I think that's the argument that could be made for any remedial scheme, whether it is common law or statutory, that the purpose of the existence of that cause of action is at odds with an immunity or defense which cuts against it. And I don't think the Texas Securities Act is different. But one thing which is different is that this is just not an ordinary defense. In fact, it was in the Troy's decision that this Court said that what you have is here an immunity. And that immunity is similar to prosecutorial immunity. It's similar to judicial immunity. It is a true immunity. And therefore — and those type of immunities have been recognized in the courts as being exceptions, even to the Texas Securities Act. The Fink v. Anderson case cited in our brief is such a decision. And the one case, which is a Federal case out of New York, that the appellants rely upon, the Morgan Stanley decision, we submit does not support them. Because in that case, it discussed a non-statutory defense. It didn't discuss what the Court in Troy's held was an immunity, a stronger level of protection. And secondly, in that case, if one looks at the opinion, the party there conceded that non-statutory defenses cannot defeat liability under Texas blue-sky law, but argued they were relevant to be considered in determining whether to grant rescission. So even in that case, you didn't have a true contest on the issue. So there is no Texas court that has ever held there is an exception for the TSA. Now, I'd like to address what was submitted in a 28J letter. We responded to that yesterday. This had been filed on Thursday by the appellants. We respectfully submit that raising an issue outside the briefing in such a letter is not appropriate. But in any event, it does not support their position. Section 23N of the Texas Securities Act does not create a recourse against attorneys. It simply says that a limitation in small business, small issuances, is subject to whatever claims are brought, whether they're accountants, attorneys, or otherwise. Now, to the extent they argue, well, if you had this broad attorney immunity that covers everyone, why would you have to have this there? And the answer to that, which we put into our responsive letter, is that there are still cases where attorneys can be sued if they participate in making a representation to the clients — not to their clients, but to non-clients, purchasers of securities. That's the McCamish case, for example. And because there are circumstances like that where claims could be brought against attorneys, there is nothing inconsistent with the concept of attorney immunity for the legislature to have made clear that this limitation on liability for small issuances applies to eight or better cases involving attorneys and accountants and others. So this argument, which only was never raised below and wasn't even raised in the briefs here, does not change the overall position, which is that there is no case in Texas which has found such an exception, that there is no exception to attorney immunity under comparable statutes. And there we point to the Texas Debt Collection Act, where there are cases we cite in our brief making clear that attorney immunity has been applied in that context. And, of course, there is no, with respect to the Federal laws we've already discussed, ability to go after aiding and abetting by attorneys because of the Federal law that governs most securities transactions. So for all those reasons, Your Honor, you know, the plaintiffs made a decision to bring this case in Federal court. They could have initiated a suit if they wished in State court and litigated in that system. And this Court has acknowledged that when you elect to go into Federal court, then one of the things that you accept is the fact Federal courts have to make these eerie predictions and have to look at the state of the law in the Texas courts and determine how that should apply. And here we have pretty clear law that Judge Godbee was right and should be affirmed. All right. Thank you, Your Honor. Thank you very much. Mr. Young. May it please the Court, just a few points. The concept of a litigation-like setting is not a concept that the appellants invented. It is a concept that this Court in the Kelly v. Nitchimoff... Why do you have any suggestion that this 5-4 decision on the Texas Supreme Court would be changed if we certify it? Well, if you certify it, the question will be presented squarely and unavoidably to the Supreme Court. Is there a litigation limitation? Four members of the Texas Supreme Court said no, now only three members because one of those four is now on this Court. Five of them went out of their way to say, we are not deciding that question. Maybe so, maybe not. We're not deciding that question and it mischaracterizes our opinion to say that we're even suggesting an answer to that question. So the reason it might be different is we don't know how those five judges or those justices would vote if the question was presented to them in a way that they needed to address it. Secondly, with respect to the lower court decisions, Mr. Singer did not cite a case that says this is not litigation, it is not quasi-litigative adversarial proceeding, but we are deciding that attorney immunity is not limited to litigation. There is no such decision out of the Texas courts. The closest you come is the LJH decision out of the Eastern District of Texas, Judge Mazant, and Judge Mazant reached his decision based on Iqbal, which is one, Cantyhanger itself. And Cantyhanger, as I've said, went out of its way to say we are not deciding that question. Lastly, with respect to the TSA, immunity is not immunity is not immunity. The case my colleague cites applying immunity under the TSA was applying sovereign immunity. Sovereign immunity enjoys an exalted place in Texas law. It is a doctrine of separation of powers and it deprives the court of jurisdiction. And so it is no answer to say that because sovereign immunity applies to TSA claims, attorney immunity must apply to TSA claims because, after all, it's got the word immunity in it. They're very different concepts. Unless the court has anything else? No. Don't mischaracterize our silence for disinterest. I would never do that. Thank you.